## Goffner v. Yellow Cab Company

*Frank J. Kernan,* for plaintiff.

*Randall J. McConnell, Dichie, McCamey & Chilcote,* for defendant.

WEIR, J., November 3, 1966.—The jury decided this case in favor of defendant, Yellow Cab Company, and

plaintiff, Miss Audrey Goffner, now Mrs. Smith, is seeking a new trial.

It all began in the most prosaic way with Miss Goffner as a passenger in one of defendant's taxis which was stopped at a traffic light and was struck in the rear by an inattentive motorist named Fusaro, but here terminates all resemblance to the usual colorless rear-end situation, because this lawsuit is not for a cervical sprain, but for slander, and it came about through an extraordinary subsequent mishap of Charles Skomski, who was an adjuster for Fusaro's public liability carrier, the Old Republic Insurance Company.

As to the vehicular collision, the innocence of Yellow Cab was recognized from the outset by Miss Goffner and by Old Republic. The latter promptly paid for the property damage and made a nominal settlement with the taxi driver, and undertook the more protracted negotiations with Miss Goffner on the customary personal injury claim which results from these occurrences. Thus it was that at one point in his settlement efforts, the adjuster Skomski visited claimant in her apartment and, upon his departure, committed the astonishing error of leaving behind his entire file of the case, and did not even notice his loss until long afterward, when it was too late. The sequel of such carelessness is as inexorable as fate itself, and so when Francis Frederick Smith, Miss Goffner's fiance, called upon her several hours later, he naturally discovered and read with consuming curiosity all those confidential commentaries which were intended only for the eyes of Old Republic personnel. It is in the nature of things that laudatory evaluations of claimants' personalities are rather rare in insurance files, and certainly this one was no exception, for among these papers was found a memorandum which constitutes the evidence against Yellow Cab in this case and which had been written by claims supervisor Donald Rutter to his subordinate Skomski in these terms:

"Hold off on contact with cabbie. Dudey Moore, Yellow Cab Claims Manager, is going to get us a release from the cabbie for $100. The cabbie lost one day's work and has a small medicine bill. They will also send you the property damage estimate. You might have trouble with cab passenger. According to Yellow Cab, she is a 'hustler'.".

A more expansive appraisal of the girl Mr. Smith was about to marry was contained in a lengthy report which the errant Skomski addressed to Rutter a month later, and in which he says that she has a reputation of being a call girl and a prostitute who, he surmised, was plying her trade in a downtown hotel on the night of the accident. Upon finishing their reading, Miss Goffner and Mr. Smith picked up the file and hastened to a lawyer, and this litigation followed in due course based upon defamatory oral assertions of Yellow Cab to Rutter and to Skomski. Both of these agents of Old Republic as witnesses in this trial vigorously denied that any employe of Yellow Cab ever said anything to them reflecting upon plaintiff's character and, therefore, there was no evidence for the jury unless relevant portions of Old Republic's file are admissible against Yellow Cab on the basis of the Uniform Business Records as Evidence Act of May 4, 1939, P. L. 42, 28 PS §91a, b, c, and d, hereinafter sometimes called Business Records Act. The trial judge ruled this point of law in favor of plaintiff and permitted the introduction of the writing of claims supervisor Rutter, which is quoted heretofore, not of course as tending to show that plaintiff is a "hustler", but only as evidence that she was so described by Mr. Moore or someone in Yellow Cab's claims department while acting on the business of that department. This ruling followed upon testimony of claims supervisor Rutter describing how insurance companies, and particularly Old Republic, compile their files in the normal routine of preparing to settle or defend cases. Thus, the jury

was permitted to determine, inter alia, whether a representative of defendant corporation had committed the "act" of bestowing this derogatory characterization of hustler upon plaintiff as contemplated by section 2 of the Uniform Business Records as Evidence Act, supra, which reads as follows:

"Sec. 2. Business Records—A record of an act, condition or event shall, in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission".

Mention has been made of the report of adjuster Skomski in which he expressed his views of Miss Goffner's reputation in unrestrained terms, but this report was not admitted into evidence for the simple reason that his disparaging comments about the young lady are not attributed therein to information derived either from Yellow Cab directly or through the Rutter memorandum indirectly. Actually, he seems to exclude Yellow Cab as the source of his scandalous references to plaintiff by specifically stating what was told to him by Moore, which is not in itself necessarily derogatory. The sole item of information which he credited partially to Moore was the fact that a detective had presented himself as representing this plaintiff. Granting that this is an odd sort of representation for a personal injury claim, we must nevertheless reject the proposition that a detective cannot be said to have come to the aid of a young lady in a legitimate cause without imputing thereby that he must also be connected with her as protecter of her assignations—or as a panderer, as is contended by plaintiff.

One of the principal arguments for a new trial is

this sustaining of defendant's objection to the admission of the Skomski report, so we shall quote the only portion thereof which contains any pertinent reference to either a Yellow Cab employe or to Rutter as follows:

"*Comment:*

"It is my opinion that there is no doubt about liability since the car was hit in the rear end due to negligence of Mr. Fusaro. As I stated previously this girl has the reputation of being a call girl and a prostitute. She is quite attractive but she is also very businesslike. She, to my understanding, is having a detective from the City of Pittsburgh act as her agent. She would not say this in the conversation but I have been able to learn this from Mr. Rutter and also the Yellow Cab Company and the insurance company, from a Mr. Moore, who handles their claims. The girl was quite friendly with me when I talked with her but I expected her to make some sort of respectable demand to settle this case. She said she had to see a doctor again who . . . is located on Negley Avenue. I have no knowledge of this doctor's reputation. She is claiming that she is suffering headaches as the result of the accident. She went to the Roosevelt-Pick Hotel at 2:00 a.m. in the morning and she was evidently there on business. She would not state her specific reason for going into the hotel except to see some friends".

While this is more of a grammatical than a legal interpretation, it is clear to us that the Skomski report, although it is part of a business record of Old Republic, does not recite a distinct "act" or "event" whereby Yellow Cab slandered Miss Goffner. The argument seems to be made that it should have been admitted in any event for its value as background material or to aid in comprehending the meaning and motivation of the Rutter memorandum, or because it may conceivably be construed to imply slanderous

words of Yellow Cab. Such argument would, of course, apply perfectly if Old Republic were defendant here, and obviously the case against it would be clear and overwhelming, but for unrevealed reasons, only Yellow Cab is accused in this lawsuit, and the employment of another company's records against this defendant must be carefully restricted in accordance with the literal terms of a statute which is in derogation of the common law prohibition of hearsay evidence: Heaney v. Mauch Chunk Borough, 322 Pa. 487.

Another argument in support of the new trial motion is the sustaining of defense objections to questions requiring certain witnesses to explain the word "hustler" as they understand it, these witnesses being neither etymologists nor experts on colloquialisms. In this connection it should first be said that Rutter, who admitted writing the critical word, was permitted to be examined intensively on what meaning he intended to convey thereby. Plaintiff also gave her definition, and the jury was instructed that the word is susceptible to an unfavorable connotation, and that one of their duties was to decide if it was so used in this case. It is insisted, however, that Moore should have been compelled to say what the word means to him, since the jury might decide that he used it in conversation with Rutter, despite the denial of both of them, and should, therefore, know what Moore meant to impart. This is equivalent to contending that it was proper to quiz him on a sort of hypothetical basis. In effect, he would be asked: "Assuming that your disavowal of saying 'hustler' to Rutter is false, what would you mean or did you mean by saying it?" Such a question is, of course, most argumentative. The accused witness cannot at one and the same time deny the commission of the act and interpret his intention in committing it. Applying such a false principle to other situations, we might ask a motorist: "If the jury re-

jects your testimony that you were almost stopped at the intersection and believes the statement of Doe that you were travelling 80 miles per hour, were you practicing for Indianapolis?" Or, one might inquire: "If you are lying about not beating your wife, what pleasure do you get out of it?"

Counsel could have called an expert to explain the slang meaning of hustler as applied to an alluring young woman, but this apparently was deemed superfluous, and in this we agree. The jury surely understood this word to begin with and, if not, they had plenty of assistance from the interrogation and speeches.

Plaintiff's contention that the trial judge erred with respect to punitive damages, even if correct, would seem to be irrelevant, since the failure of the jury to award even ordinary or nominal damages, as reflected by the defense verdict, indicates that they were not convinced that Mr. Moore wronged plaintiff at all. This leaves only one other point, namely, the questioning of plaintiff's husband, Mr. Smith, in respect to his conviction for failure to obtain a Federal wagering stamp. This came about somewhat indirectly and without objection when the witness was speaking of his lack of experience in testifying, and then was repeated in response to a flat question. In any event, it was entirely proper because one of the historical means of impeachment is to show that a witness has been convicted of an offense which is of the nature of crimen falsi. Evasion of a gambling tax is an act of deceit no matter that the gambling which is covered by the tax does not itself reflect moral turpitude; just as when a lawyer wilfully fails to file his income tax, it is no answer to say that the practice of law is honorable. An offense which involves concealment, perversion of the truth or cheating is crimen falsi, even when designated as a misdemeanor: Commonwealth v. Vis, 81

Pa. Superior Ct. 384; Commonwealth v. Mueller, 153 Pa. Superior Ct. 524; Commonwealth v. Albert, 169 Pa. Superior Ct. 318.

Before continuing to the final and dominant point of legal discussion, we shall allude briefly to the factual situation as it impressed the trial judge. We first wish to say in fairness to this young woman plaintiff that there was nothing in the evidence which suggested anything unfavorable about her and contrariwise, there were persuasive indications that she is a proper, modest and industrious person. The incidental quality of comeliness does not, of course, establish a presumption against her virtue. "Then why the verdict against her?" it may be asked. We think that the answer lies in our own impression resulting from seeing and hearing the witnesses to the effect that the representatives of Old Republic simply happened to be unduly intrigued by Miss Goffner's activity at the time of the accident. The business of processing insurance claims is not conducive to acquiring a favorable view of human nature, and those who are engaged therein must be careful to avoid a warped and perverted view of human conduct, else they may become more "sheltered" from the facts of life than those who are sheltered by their innocence. To the minds of these claims adjusters, there seems to have been a salacious implication in the fact that a girl would be going alone in a cab to a club of unsavory reputation after midnight and without a clear recollection or understanding of whom she was going to meet. They did not seem to realize that nowadays it is not extraordinary for ladies to reject the fireside, even when they have the misfortune of lacking escorts, and that the gregarious urge of both sexes is stimulated by the current mania for turbulent dancing—dancing which happens also to be of such a nature that the identity of one's partner is inconsequential, since one has practically no contact

with him. So, without belaboring the matter further, it is easy for us to understand the complete propriety of the young lady's visit to the Club "30" and her failure to recall clearly her intended companions, but, unfortunately, this was not apparent to Old Republic's investigators. And, naturally, when an investigator adopts an idea or a conclusion which he chooses to present as a fact, he is disposed to attribute it to a source other than his own ruminations.

We are not suggesting that the Rutter memorandum was intentionally false, but only that it was heedlessly inexact. Rutter did not even know the correct nickname of the prominent "Dinty" Moore. What might have happened here was that he asked the latter if he did not think there was something questionable about plaintiff's situation at the time of the accident, and he might have got an answer, "Well, maybe so", or something like that. Mr. Moore is recognized by the trial bar as one who would be most unlikely to volunteer an adverse comment about anybody. The jury perhaps sensed this personal quality, even upon brief acquaintance with the accused, but whatever route their reasoning followed, it is more than likely that they reached the truth in exculpating Mr. Moore and Yellow Cab.

Having thus cleared the air, we hope, of any inference of immorality on the part of anyone, we turn to the transcendent issue, namely, whether the trial judge erred in ruling that there was a case for the jury against Yellow Cab when the only evidence was the Rutter memorandum in the Old Republic file. It cannot be said dogmatically that this ruling was obviously either right or wrong, based upon precedent, because so far as our research reveals, there has been no case comparable to this one in any jurisdiction, although the Uniform Business Records as Evidence Act has existed in many States for many years.

We are not troubled by any doubt about the original purpose of this salutary statute, which is rather well known and which, of course, had nothing to do with the use which was made of it in this instance. The reason for such a legislative relaxation of the common law rule against hearsay evidence is explained in a myriad of decisions, many of which are cited in footnotes 9A, U. L. A., pages 506-31. Mr. Justice Cohen is the author of one of these discussions of the desirability of enlarging the old shopbook exception to the hearsay rule in the Pennsylvania Supreme Court case of Fauceglia v. Harry, 409 Pa. 155. It simply is not feasible in terms of time and expense, and may be literally impossible in the complex posture of modern existence to develop the facts of a situation in the judicial process without resort to the use of annotations entered in business records. There are many available illustrations of this principle, but none is better than the familiar example of hospital charts, which appear with such frequency in our civil trials. If it is a record of emergency treatment, there is the preliminary problem of identifying the person who wrote the note and then the likelihood that he was an intern or resident whose present whereabouts are unknown or at least beyond the reach of a subpoena. When we come to in-patients, the problem grows worse, because innumerable nurses and physicians will have been found to have contributed various factual observations or comments to the chart and sometimes attested by their initials which cannot be deciphered even by the record librarian, although if they happen to be identified and are for some reason or other called as witnesses, they rarely know anything except that which is written, and which is probably as accurate as human recitals of events are ever likely to be.

In connection with this reference to choosing some-

times to call the person who helped to compile a business record, as opposed to simply introducing the writing itself, it is appropriate to mention that in 1944, our Supreme Court, in the case of Lane v. Samuels, 350 Pa. 446, seems to have limited the introduction of a business record under the Business Records Act to situations where the author is not available by saying that "it must appear that it is necessary to rely upon it". Now if this case, which stands by itself, is deemed the law of Pennsylvania, our problem is solved and, of course, the Rutter memorandum was inadmissible because Mr. Rutter was not only available, but was actually on the witness stand. We do not think, however, that the test of availability of the writer is really intended to be an indispensable prerequisite to the introduction of the writing in most situations, and surely not with respect to hospital records, where we have the other cogent considerations of expense and inconvenience, not to mention confusion in calling a great number of people to supply components of a picture which is more clearly portrayed by the chart itself. It may well be, however, that we should say that this pronouncement of Lane v. Samuels, supra, should be applied where it is equally convenient to call the writer as to produce the writing, and especially so when, as in this present case, the writer must be called anyhow. Certainly this could be a very reasonable construction to place upon Lane, bearing in mind that the Business Records Act is designed to remove unrealistic barriers to the revelation of simple truths, and not to provoke litigation. Nevertheless, we do not need to decide the present issue on the somewhat uncertain proposition that the doctrine of Lane was intended to apply beyond its own facts or that it applies here. Nor is it essential to determine whether the pertinent language of the Rutter memorandum, "According to Yellow Cab, she is a 'hustler' ", when viewed in conjunc-

tion with the prior reference to Moore, is really "A record of an act, . . . or event . . ." performed by Yellow Cab, as opposed to an interpretive summary by the writer of what he deduced from dialogue with Yellow Cab. The sentence is probably dichromatic.

We do not undertake to decide these interesting propositions because we are more influenced by another matter. It has been noted that we have uncovered no case whose facts are apposite to those with which we are dealing and, therefore, the propriety of submitting this issue to a jury solely on the basis of the Rutter memorandum is apparently a question of first impression. After mature reflection, we are persuaded that it was wrong to have done so. Such an interpretation of the scope of the Business Records Act is at variance with the more restrictive interpretations which we observe in the great majority of decisions in Pennsylvania and elsewhere. The general thread of thought running through these decisions is that the Business Records Act is designed to eliminate serious technical obstructions to the pursuit of justice by allowing reliance upon hearsay evidence from business records to the extent which is logically or reasonably required by the circumstances. There is a mandate in section 3 of the act that it should be interpreted so as to create uniformity of impact in all of the States which embrace it. *Consequently, we say, with respect to the present case, that the Business Records Act does not intend that a comment in a business record shall both create a new cause of action and all by itself support such cause of action against a person who is mentioned therein, but who lacked both knowledge and control of the preparation of the record.*

A person cannot be held answerable in damages solely on account of a comment attributed to him in a writing of another person by merely authenticating the authorship of the writing. He is protected by the

hearsay rule because the writing itself cannot be cross-examined. There would seem to be no persuasive reason to hold otherwise just because the writing happens to be a business record, and we cannot think that the legislature intended such a result, which would be unfair and which would permit great mischief. A party who is wronged by what is written has his redress by action against the publisher.

Therefore, we believe that the trial judge erred, not necessarily in admitting the Rutter memorandum, but in refusing binding instructions for defendant when this memorandum constituted the only evidence in the case.

Perhaps no investigative material from an insurance company file should ever be admitted into evidence under the guise of a business record. We can test this proposition better if we assume a situation wherein the insurance company is defending its assured against a personal injury claim and proposes to introduce quotations from witnesses which are contained in its investigative file, witnesses who cannot be located for trial or are otherwise unavailable. We can imagine the incredulous outcry of plaintiffs' counsel which would greet this self-serving proposal. However, the self-serving nature of such evidence would not seem to be a good reason for its exclusion if the investigative file is deemed a business record, since the original shopbook rule itself permitted the introduction of self-serving entries from books of account, this being the very essence of the rule. In the case of Neuman v. Pittsburgh Railways Company, 392 Pa. 640, it was held that defendant could not introduce a statement of its conductor under the Business Records Act. The decision followed the reasoning of Palmer v. Hoffman, 318 U. S. 109, that a railroad is in the business of transportation, and records prepared for possible litigation are not part of its business. This can

hardly be said of an insurance company, paying and defending claims being very much a part of its business. Yet the Pittsburgh Railways Company had a larger activity in claims and litigation than any single insurance company within its area. So the admission of relevant quotations from an insurance company file, while excluding the same thing from a transportation company file, will result in unequal application of the rules of evidence, a result which is most undesirable. However, it is not necessary to resolve this difficulty presently in view of our preceding pronouncement.

In summary, we are rejecting the motion for a new trial for two separate reasons: firstly, that there is no sufficient reason to disturb the verdict of the jury, and secondly, that defendant's point for binding instructions should have been affirmed.

ORDER

And now, November 3, 1966, in accordance with the foregoing opinion, the motion of plaintiff for a new trial is refused.